In the Matter of DENNIS GLAVAS, an Infant.

Domestic Relations Court of the City of New York, Children's Court, New York County, April 28, 1953.

*Shad Polier* for David Silver, petitioner.

*George A. Timone* for John Glavas, respondent.

PANKEN, J. This matter came on before the Children's Court Division of the Domestic Relations Court of the City of New York, first, on the 14th of January, 1953, on a petition charging the father with neglecting the child. After a hearing, the child was found to have been neglected by his father.

It may be beside the point to here inquire into the bases for the establishment of Children's Courts; yet it must always be borne in mind when the rights and interests and the protection of a child are to be considered, to remember that the children's courts were instituted for that purpose. The rights, interests and protection of children are always paramount. They are superior to the rights of parents when they are in conflict with what is best for the child. Children's Courts were established in this State, as elsewhere throughout our nation, to serve definite purposes. Uniformity in legislation establishing the Children's Courts has not yet been achieved. There is, however,

general uniformity as to the purposes for which Children's Courts are established. The intent and purpose always is to protect children against neglect by their parents or others; to protect children against themselves because of delinquency. Children are not charged with commissions of crime, even in cases where life has been taken by a child who is under the age of fifteen years.

The Children's Court Division of the Domestic Relations Court of the City of New York is charged with many duties to safeguard the rights and interests of children. And it is right that it should be so. That community which protects its children against neglect by parents or others who stand in *loco parentis,* cares for its juvenile delinquents, diminishes the incidence of child delinquency. The community which fails to protect its child against neglect suffers from a greater incidence of misconduct on the part of children amounting to delinquency.

Children's Courts are often confronted with insoluble problems, problems which are difficult to meet and to dispose of; sometimes it is because of the insistence on the part of one parent or the other upon what the religious affiliation of their child should be, and so difficulties creep in regardless of the harmful consequences which may flow to the child. It is not easy to pass upon, indeed, it is quite difficult, as to what the religion of a child is; as in this case, when the child is only four years old, and there is a sharp difference between father and mother on that question. I should think that the welfare of and the future for the child should be controlling; and the religious affiliation of the youngster might very well be held in abeyance until he, himself, is in the position to determine what religion he desires to follow providing, always, that ethical concepts and life in response to such concepts are inculcated and instilled in the child.

Under our law, when a child is neglected and it is so found, or even if it be a baby, or a child is found to be delinquent, the religion of the child is to be established to make possible its placement either on remand or commitment to an agency or foster home, when the child cannot be returned to the bosom of his family. The law, as it is, is binding.

In its wisdom, the Legislature provided that, " placement or parole must, when practicable, be with or within the custody of the person or persons of the same religious faith or persuasion as that of the child." (N. Y. City Dom. Rel. Ct. Act, § 88, subd. 2.) It is mandatory, therefore, that when practicable, a

child should be placed in the custody of persons or agencies of the same religious faith or persuasion as that of the child. Parenthetically, sometimes I question whether a child under the age of four or six or seven has a distinctive religious faith or has any particular religious persuasion. Children who are *non sui juris*, or who have not as yet reached the age of reason, cannot be converted from one religion to another. A Catholic, Protestant, or Jewish child may not be converted to another religion or faith if he is under the age of seven since the child has not yet reached the age of reason. Conversion, when effected, if effected, is accomplished by the parents.

While parents are endowed with the right and a duty to guide the steps of their children in the formative years in life, as well as towards a religious faith of the child, when the steps mapped out are harmful, either because of inadequacies or unfitness or neglect by the parent, the right of such parent may be limited, curtailed. The religion of a child, however, is not a matter in which the court may interfere except when it becomes an issue of fact to be determined in providing protection and proper care for the child.

Children's Courts have come into existence, undoubtedly, in response to a greater understanding of the forces and influences necessary in the upbringing and protection of our childlife to the end that ultimately the citizenry of any community which, in a full measure, may respond to the duties which co-operative and communal life calls for and imposes. The law is a living organism; it must be stable. It must not, however, be permitted to remain or become static. The philosophy of the law and the changes in the philosophy of the law and in the law itself occur in response to changed conditions and changes in the mentality, psychology and culture, due to political, economic and social changes which at one time or another prevail in the group.

What is here said is not new. In 1735, defendant John Peter Zenger, who envisioned for us and for the world the need, possibilities and right to a free press, who so courageously defended that right and who so defended the right of free speech, Andrew Hamilton, the foremost lawyer of that day in the course of his address to the jury trying Zenger said, "Numberless are the instances of this kind that might be given to show what is good law at one time and in one place is not so at another time and another place." The law, to serve its purposes, changes with the times and the places in which it is enacted and applied. The law creating the Children's Court was enacted and responds to

changes in attitudes of mind as well as to changes in the community with a greater sense of social responsibility in respect to its duties to children.

The matter before me, while not complex is nevertheless involved. As other issues, it must be decided upon the facts as they are established. Judges must believe all who appear before them, particularly when they testify under oath. A judge must assume that each witness has regarded his oath seriously; the witnesses have told the truth as they saw it and set forth the facts which to him appear to be uncontrovertible. In this case there is a conflict between those asserting one set of facts as against those asserting another set of facts. The testimony to establish the facts must be carefully scrutinized when there is conflict.

The question to be decided here is whether the boy concerned in this proceeding is Jewish or Roman Catholic. It is asserted and testimony submitted that this child had been circumcised according to Jewish rites early in the year of 1948, and therefore he is of Jewish faith. Circumcision, of itself, does not mean that a child is of Jewish faith. Much medical authority believes that it is also a health measure. However, when a child is circumcised within the tenets and rules prescribed by the Jewish religion, the circumcision establishes and completes the Jewishness of the child as to his religion. Usually circumcision takes place eight days after birth or as soon as his health permits.

Some four years or more after the circumcision, in October, 1952, the father of this child had him baptized by a priest of the Roman Catholic church, and he claims that the child is now a Roman Catholic. It would appear that by circumcision according to Jewish rules and rites and by baptism according to the Roman Catholic church, the child has two religions and has been accepted in both religions. The question to be solved and answered, here, is, has the baptism in October, 1952, superseded the circumcision in 1948; and has a father without the consent of the mother the right to change the religion of his child? That is a matter of law.

It is my understanding in conversion from any religion to any other religion the person must know and understand the tenets of the church and accept its standards. The Catholic church will test very carefully the sincerity of one seeking to be converted to Roman Catholicism though he had taken instruction for a shorter or longer period of time. If a Jew seeks conversion to Catholicism he must aver, and beyond that, with all sincerity

that he understands and accepts the tenets, the rules and the theology of Roman Catholicism. Does it apply to a child four years of age? The child at that age has not yet, under the most favorable conditions, reached the age of reason.

It is the father's view in this case that he had the right to convert the child from the Jewish religion to the Roman Catholic church and so had him baptized as a Roman Catholic. The evidence establishes the fact that the child had been circumcised. While the father was not present at the ceremony, he knew that the ceremony was to take place and acquiesced therein and agreed that the child should be initiated into life as a Jew. He continued to live with his wife up to the spring of 1952, until she had become pregnant and was taken to a hospital. The facts are that in September of 1952 the mother was sent to a hospital and remained there until the end of February, 1953. It was while the mother was in the hospital that the father had, without her knowledge and consent, baptized the child as hereinabove set forth. The father did not visit the mother of the child at the hospital from September to the end of her sojourn there but twice, at the beginning of her stay in the hospital and at the conclusion thereof.

Nothing during the four years intervening between the first ceremony and the second ceremony has changed except the baptism. There has been no change in the attitude of the mother. The father avers that there had been a change in attitude insofar as he was concerned.

It is significant that the father is not a Roman Catholic. He testified that he was and still is of the Greek Catholic persuasion, not the Greek Catholic church according to Roman rites. He did, from time to time, he said, visit or attend Roman Catholic churches. Attendance at service of one religious group or another does not *ipso facto* change one's religion. Religion cannot be changed for a person just because of association with others of a different religious faith. Associating with Jews does not make one a Jew, nor does associating with Catholics make one a Catholic. Something more than that is prescribed by all faiths in connection with a conversion. For Catholic, Jew, Protestant, I believe Mohammedan, as well, an affirmative act must be performed before one is accepted into any church. Baptism by a priest or minister into any church, or circumcision according to Jewish rites is required. I am not sure what the Mohammedans would require.

Why the father had the child baptized as a Roman Catholic and why he waited four years to do so has not been explained. He had continued to live with his wife, the mother of his child, during that period excepting for the time she was hospitalized. That does not seriously affect the question as to whether the boy is Jewish or Roman Catholic, but the good faith of the father is put in issue. The faith of a person changing the religion of his child should be considered. It should be considered as to whether since the child is *non sui juris* the act of the father was in response to a conviction, an honest belief, a change of faith or persuasion, or desire to change religious affiliation or principle, or was it merely in response to a momentary whim or some other factor. The father did not impress me as being deeply concerned as to what denomination or religion his child should follow.

In *Matter of Santos* (278 App. Div. 373, 375) the court, *Per Curiam,* said, " It was and still is practicable to give these infants * * * under the control of persons of their religious faith in fulfillment of the statute that their ' religious faith shall be preserved and protected by the Court ' (N. Y. City Dom. Rel. Ct. Act, § 88, subd. 4). * * * the children have a natural and legal right of which they cannot be deprived by their temporary exposure to the culture of another religion prior to the age of reason."

If the child is Jewish, it cannot be deprived of its Jewishness by an exposure to the culture of another religion prior to the age of reason. In *People ex rel. Sisson* v. *Sisson* (271 N. Y. 285, 287) the Court of Appeals said, " In proceedings for the custody of children the courts have reiterated that their sole point of view is the welfare of the child." If a change in religion before a child reaches the age of reason exposes the child to a culture or religion which it cannot understand and hence cannot accept, there is a trauma — at least to his emotions.

The father has rights with respect to his child. So has the mother. Neither has a superior right to that of the other. While a father may have custody of his child, the condition giving him custody does not suspend or liquidate the rights of the mother and deprive her of her say as to what her child's religious faith should be.

Repeating possibly, children of tender age are incapable to decide what religious faith they are to adopt or follow. The parents of the children have the right to select the religion of their young. Usually — uniformly, I should say — parents will induct their children into the church with which they are affili-

ated, and when the child is the issue of a mixed marriage, the parents agree between themselves as to the religion the child should follow. In this case it is claimed by the mother it was agreed between the parents that the child should follow a definitive religion.

It has been held quite uniformly that parents have the right to select the religion of their children. It is questionable in my mind whether the courts would go the distance in preserving the rights of parents to include therein the right to repeatedly change the religion of a child after it had been baptized or circumcised. If that were so, parents might change the religion of a child periodically and even do so in all sincerity without any regard as to the impact that the changes will have upon the child. The right of parents to change the religion of a child as to them seems proper or right might result in the child's being taken from a Protestant to a Catholic or Jewish or Mohammedan or Confucian church. That, it seems to me, is not contemplated either by natural law or the law as it stands or public policy, or the needs of the child.

A most important factor in the evolution of character in children is a sense of security. Without security the child might develop an inferiority complex. A child's future is deeply affected either by a sense of security or insecurity in the formative period during his upbringing. Change of religion in children of tender age may well do violence to a sense of security.

To determine the rights of the parents, the court must always bear in mind the needs and the rights of the child, too. One cannot supersede the other. The former cannot supersede the latter.

To provide a child with love of his parents so that he might obey the commandment which requires him to honor his father and mother, they must agree upon the religion of the child, and if they cannot agree, harm is in store for the child. Disagreement on religion, as other disagreements in the family unit, and particularly in religion, reacts detrimentally to the welfare of the child and to the serenity of the home of which the father and mother should be a part.

The testimony is clear that the father knew of the ceremony attendant upon the boy's induction into the Jewish religion. He acquiesced in that. A witness called on behalf of the mother, representing the Jewish Child Care Association, testified that the father had applied to that agency for placement for his child and an inquiry was made as to what was the religion of the child. The following questions were asked of this lady witness:

" Q. At the first conversation you had with the father, Mr. Glavas, did you ask him the religion of the child? A. Yes.

" Q. What did he say? A. He said the child was Jewish."

This conversation took place in January of 1953, approximately three months after the Roman Catholic baptism of the child.

The questions to be determined by me are, (1) has the child been circumcised according to the Jewish rites before he had been baptized according to the Roman Catholic church precepts? I find as a matter of fact that the testimony is abundant on that question as to whether the child was initiated into the Jewish religion and circumcised according to the rules and tenets prescribed for the performance of that ceremony. (2) The question to be decided is, does the baptism of this child, four years old, and four years after he had been initiated into the Jewish religion in compliance with prescribed tenets and rules supersede his admission to the Jewish religion, and deem him converted to Roman Catholicism? The evidence on that score seems to me to be quite clear, that the father, who is a Greek Catholic, not of Roman rites, for unexplained reason, without the consent of the mother, whatever his purpose was, caused the child to be baptized by a Roman Catholic priest, and not having the consent of the mother, not even having apprised her of that; the baptism does not supersede the circumcision. (3) The question to be decided by me is, can a father without the consent of the mother change the religion of his child? There was statutory law until this year that even the changing of the name of a child may not be accomplished by one parent without the consent of the other. The question of religion is much more important than a change of name, and hence, I find as a matter of law that a change in the religion of a child cannot be effected unless both parents consent thereto.

I wonder if a father without the consent of the mother of a child might change the religion and change it again *ad infinitum*, or even whether both parents can repeatedly make changes in the religion of a child. While that is not the matter to be decided here it nevertheless poses a question which should be determined. In my judgment, parents should not change the religion of their children after they have been accepted and initiated into a definite religion unless both consent, and that should also be done only if no harm will flow to the child. Parents may change their own religion. They are adult. They presumably act on conviction. It is not fair, however, to expose a child, as it has

been said in *People ex rel. Sisson* v. *Sisson (supra)*, to possible trauma which changes in religion and culture may cause.

I find as a matter of fact that the child is Jewish; that the baptism did not change the boy's religion. My finding here does not preclude the possibility of a change in religion of the child if both parents agree thereto. I should, however, advise serious thought on the part of both parents as to whether the child should embrace a religion other than the religion of either of the parents. That, certainly, would do harm to the child. The father is a Greek Catholic, the mother Jewish, and the child in some other religion. He will find himself rather at sea.

The remand as has heretofore been made is continued. The date of the end of the remand is to be agreed to by counsel and the probation officer in charge of the case. The court will make such other disposition in the case as the situation may warrant. The father is entitled to visitation with his child; that should be worked out between counsel and an order on consent entered.